OPINION OF THE COURT
James A. Yates, J.
Pursuant to CPLR article 78, petitioner challenges the City Planning Commission’s January 28, 2008 determination, and the City Council’s March 26, 2008 decision approving plans for development in Manhattan. The City respondents granted zoning text amendments, zoning map amendments, and special permits to co-respondent, East River Realty Company (ERRC). ERRC seeks to develop the former[1] Consolidated Edison (Con Edison) site along First Avenue in Manhattan.
Windsor contends the City violated the Open Meetings Law (Public Officers Law § 100 et seq.) during its December 5, 2007 public hearing on ERRC’s development proposal. It also argues the ERRC proposal was modified substantially, warranting a new public hearing. Windsor seeks judgment (1) annulling the January 28, 2008 and March 26, 2008 resolutions, (2) remanding the determinations for de novo review, and (3) directing ERRC to provide certain monies for past expenses and a fund for future damages and indemnification.
For the following reasons, the petition is denied, pursuant to the Open Meetings Law (Public Officers Law § 100 et seq.), New York City Charter § 197-c and 62 RCNY 2-06 (c).
*492 Background
In 2005, ERRC acquired four tracts of land from Con Edison in midtown Manhattan. The properties are Con Edison’s former sites for steam and electrical plants, along First Avenue, between East 35th and 41st Streets. The land is now vacant. ERRC intends to transform this former industrial site into a residential and commercial development.
A. The Development
The development on two sites would total 9.7 acres containing approximately five million zoning square feet of floor area. It would consist of six residential towers totaling approximately 3.5 million square feet and 4,137 new dwelling units. The development would also include one commercial tower of approximately 1.37 million square feet, over 70,000 square feet of retail space, 1,557 parking spaces, 4.8 acres of open space, and a new public school.
To accomplish this goal, the land needs to be rezoned from its former manufacturing designation to new designations allowing commercial and residential development. ERRC, therefore, applied to the New York City Planning Commission to amend the City’s Zoning Resolution and zoning map. ERRC also sought special permits and certifications.
B. Land Use and Environmental Reviews
ERRC’s applications were subject to environmental review under the New York City Charter’s Uniform Land Use Review Procedure (ULURP), the State Environmental Quality Review Act (ECL § 8-0101 et seq. [SEQRA]), the State’s regulations under SEQRA (6 NYCRR part 617), and the City’s rules and procedures for implementing SEQRA, entitled City Environmental Quality Review (Mayoral Executive Order No. 91 of 1977 [62 RCNY 5-01 et seq.]).
The Commission acted as the lead agency and performed the environmental analysis of the development. It needed to determine whether an environmental impact statement (EIS) was necessary, to ensure its completeness, and to conduct public review. On January 20, 2006, the Commission defined the subjects for study in the draft supplemental EIS (DSEIS). It held public meetings on this draft scope of work on March 28, 2006, and May 16, 2006. ERRC’s consultants then prepared a comprehensive DSEIS. On August 14, 2006, the Commission issued its final scope of work. The City’s Department of City Planning (DCP) certified the applications, including the DSEIS, as complete on August 27, 2007.
*493 The DCP then referred the applications and DSEIS to Manhattan Community Board No. 6 (CB 6) and the Manhattan Borough President. CB 6 held a public hearing on September 20, 2007, and recommended conditional disapproval. On November 2, 2007, CB 6 and the Borough President received ERRC’s modified applications. The Borough President also recommended conditional disapproval on November 28, 2007.
On December 5, 2007, at 10:00 a.m., the Commission held a public hearing on the applications and DSEIS in Spector Hall at 22 Reade Street. Approximately 100 people attended the hearing. Those who could not fit into the hall sat in the building’s lobby, which was equipped with a video broadcast where they could view and listen to the proceedings. About 50 people spoke at the hearing, and all who wished to testify had the opportunity.
ERRC prepared a final supplemental EIS (FSEIS) after receiving oral and written public comments. The Commission accepted it and issued a notice of completion on January 18, 2008. The FSEIS included possible alternatives to the project, including a plan proposed by CB 6 pursuant to New York City Charter § 197-a. On January 28, 2008, the Commission approved the ERRC applications and the CB 6 section 197-a plan, both with a number of changes.
The City Council then reviewed the Commission’s findings. On February 25, 2008, the Council held a public hearing on those findings. On March 12, 2008, the Council’s Land Use Committee held a public meeting. It proposed modifications, and remanded the matter to the Commission on March 14, 2008. On March 17, 2008, the Commission held a public meeting to consider whether the modifications raised environmental issues requiring further review. On March 24, 2008, the Commission determined they did not. Two days later, on March 26, 2008, the Council approved the Commission’s findings as modified.
C. The Final Determinations
The final determinations rezoned the sites. Previously, the sites allowed industrial uses and prohibited residential uses. Under the final determinations, the sites allowed high-density residential, commercial, and community facility uses. The City also granted special permits for height and setback waivers, and a public parking garage.
D. Restrictive Declaration
On April 17, 2008, the City imposed four main obligations on ERRC’s development in a restrictive declaration. First, the re *494 strictive declaration required ERRC to mitigate unavoidable environmental impacts. Second, the new development must include open space, and the restrictive declaration provided details for that requirement. Third, the new development must also include a public school. Fourth, ERRC must develop a construction protection plan (CPP) to protect 5 Tudor City Place (i.e., Windsor Tower), part of Tudor City, a designated city landmark. ERRC must provide noise control and air quality control measures during construction.
E. Procedural History
On April 23, 2008, 5 Tudor City Place’s tenant-shareholders filed this article 78 petition against ERRC, Mr. Solow (an ERRC principal), and the City. ERRC and Mr. Solow moved to dismiss on June 27, 2008. On July 7, 2008, the tenant-shareholders moved for joinder of party and class certification. The City responded with an addendum to ERRC’s motion dated July 8, 2008. One critical issue was that the tenant-shareholders lacked standing or the legal capacity to file the petition. Consequently, on August 5, 2008, the parties agreed to substitute Windsor as petitioner. Nevertheless, Windsor still seeks class certification and party joinder of the tenant-shareholders.
Discussion
The questions before the court are: (1) whether the City knowingly or intentionally excluded the public from the December 5, 2007 public hearing, and (2) whether the posthearing modifications to the original land use applications required the Commission to recommence the entire public review process.[2]
A. The December 5, 2007 Public Hearing was Proper Under the Open Meetings Law (Public Officers Law § 100 et seq.).
The Open Meetings Law requires that public body meetings conducting public business, other than executive sessions, “be open to the general public” (see Public Officers Law § 103 [a]; § 102). Its purpose is to ensure that “public business be performed in an open and public manner.” (Public Officers Law § 100.) The public must be “able to observe the performance of public officials and attend and listen to the deliberations and decisions that go into the making of public policy.” (See id.) *495 “[T]he Open Meetings Law[ ] should be implemented in a manner that gives reasonable effect to its intent” (NY Dept of State, Comm on Open Govt, Open Meetings Law Advisory Op 2648a [1996]).
“[T]he Open Meetings Law does not specify where [or when] meetings must be held” (jd.), only that they are in “facilities that permit barrier-free physical access to the physically handicapped” (Public Officers Law § 103 [b]). It requires public notice at least 72 hours before a meeting scheduled at least one week in advance. For meetings scheduled less than a week in advance, the City must publish notice at a “reasonable time prior” to the meeting. Notice also “shall be given to the news media . . . and shall be conspicuously posted in one or more designated public locations.” (Id. § 104 [1], [2].)
“[T]he Open Meetings Law [is] to be liberally construed in accordance with [its] purposes” (see Matter of Gordon v Village ofMonticello, 87 NY2d 124, 127 [1995]). A court has “the power, in its discretion, upon good cause shown, to declare any action or part thereof taken in violation of [the Open Meetings Law] void in whole or in part” (Public Officers Law § 107 [1]). “Good cause” factors include “insufficient notice, unreasonable starting times, improper convening of executive sessions, and improper exclusion of members of the public” (see e.g. Matter of Goetschius v Board of Educ. of Greenburgh Eleven Union Free School Dist., 244 AD2d 552, 553 [2d Dept 1997]).
“[N]ot every breach of the ‘Open Meetings Law’ automatically triggers its enforcement sanctions” (Matter of New York Univ. v Whalen, 46 NY2d 734, 735 [1978]). Courts do not overturn decisions based on technical violations or negligent failure to comply precisely with the Open Meetings Law (see e.g. Matter of Roberts v Town Bd. of Carmel, 207 AD2d 404, 405 [2d Dept 1994] [finding executive session discussions regarding design work constituted negligent failure to comply with Open Meetings Law insufficient to invalidate Board actions]; Kessel v D’Amato, 97 Misc 2d 675, 681-682 [Sup Ct, Nassau County 1979] [finding luncheon discussing proposed budget was legislative body assemblage for particular business purpose but was merely technical violation and did not warrant invalidating budget]).
Windsor contends that the time and location of the December 5, 2007 hearing violated the Open Meetings Law. It claims: “The Commission’s [sic] scheduled the December 5, 2007 so-called ‘public hearing’ in a small room at a mid-week mid-day *496 hour and therefore chilled participation by the many neighbors of the new development who wanted to testify against the gross overbuild.” (See petitioner’s reply mem of law, Aug. 14, 2008, at 2.)
Windsor notes that the City received “many written and oral objections by our elected officials and by neighborhood representatives” to the hearing’s time and location. Windsor’s counsel also “begged [the City] to remedy this.” (See id. at 42.) According to Windsor, “Community Board meetings about [the development] always had three, four hundred people attending.” Windsor assumes “[t]he same number of people” would attend the December 5, 2007 hearing. (Transcript, Nov. 12, 2008, at 9.)
Windsor elaborates that
“if it is known in advance of a meeting that a larger crowd is likely to attend than the usual meeting location will accommodate, and if a larger facility is available, it would be reasonable and consistent with the intent of the [Open Meetings] Law to hold the meeting in the larger facility. Conversely, ... it would be unreasonable to hold a meeting in a facility that would not accommodate those interested in attending” (see Comm on Open Govt OML-AO-3403 [2002]).
Finally, Windsor claims that this case parallels Crain v Reynolds (NYLJ, Aug. 12, 1998, at 21, col 2 [Sup Ct, NY County]), where the court held that the Board of Trustees had violated the Open Meetings Law. In Crain, the court agreed with petitioner, finding that
“misleading information was given to the press; the meeting room was too small to accommodate the number of people known to have an interest in the issue and likely to attend the meeting; preferential access to the meeting was given to [staff and press]; and all members of the public who were admitted to the meeting room were required to leave before the Trustees voted” (see id.).
The court finds that Crain is distinguishable from the present case. In Crain, as indicated, the court found numerous intentional violations including misleading information regarding the purpose of the meeting, exclusion of the general public in favor of selected attendees, and that the public was continuously excluded as the meeting progressed and space became available.
*497 Here, in contrast, "[th]e December 5, 2007 public hearing was held in Spector Hall at 22 Reade [S]treet in Manhattan, the usual location for [the Commission’s] public hearings, [and] at 10 a.m., the usual morning time for [the Commission’s] public hearings” (affidavit of Mackintosh 1Í 35). Since September 11, 2001, the chair’s “standing decision” is to hold hearings at Spector Hall, rather than City Hall, pursuant to 62 RCNY 2-06 (f) (1) (see id. 1Í 36).
Spector Hall provides
“sixty-five (65) seats for members of the public wishing to attend the public hearing to sit. Seating is available on a first-come, first-served basis and there is no ‘reserved’ or ‘priority’ seating for elected officials or others. In addition, there is some remaining space within Spector Hall where people are permitted to stand, and no one is asked to leave if they are standing . . . [A]t least thirty-five additional chairs are placed in the lobby.”
At the December 5, 2007 public hearing, the lobby contained a television monitor and sound system. This “enable[d] those persons who were in that area to view [and hear] the meeting.” (Affidavit of Parnés 1111 4, 6, 8.)
After the Commission scheduled the public hearing and published notice,[3] four elected officials[4] and the CB 6 chair requested a time and location change. They sought “to ensure that the greatest number of community members will be able to participate.” The chair responded to each of their letters, assuring that the development “would be the focus of the agenda on December 5th.” Although the Commission was “unable to change the location or time,” it would “sit until [it] heard every speaker that has signed up to testify. The Commission does not recess for lunch or dinner.” (Respondent City exhibit 13.)
*498 In total, at the December 5, 2007 hearing, 52 people spoke at the meeting. Speakers included one Member of Congress, two State Senators, two Members of the Assembly, three Members of the Council, a Borough President representative, Windsor’s counsel, and one of Windsor’s Board of Directors. (See respondent City exhibit 20; see also affidavit of Parnés If 10; respondent City exhibit 33, at 47.) “All attendees who signed up to speak were permitted to testify” (affidavit of Mackintosh 11 35). Additionally, the Commission “accepted written testimony” until December 17, 2007 (see respondent City exhibit 21; see also affidavit of Parnés 1f 15).
The court finds no evidence that the Commission denied anyone who wished to speak an opportunity to do so. Nor does the record reveal that the Commission intentionally or knowingly discouraged anyone from attending. Thus, the time and location of the December 5, 2007 public hearing were proper.
B. The Modifications Made to the ERRC Proposal Following the December 5, 2007 Public Meeting are Not Substantial as to Require Another Hearing.
City Charter §§ 197-c and 197-d describe the public review process for zoning changes as ERRC proposed. Once the DCP certifies a section 197-c application as complete, the affected Community Board reviews it within 60 days {see NY City Charter § 197-c [e]). The Community Board then files its recommendations with the Commission and the affected borough president. The borough president also files his or her recommendations with the Commission within 30 days. {Id. § 197-c [g].)
Thereafter, within 60 days, “the [CJommission shall approve, approve with modifications, or disapprove the application” {id. § 197-c [h]). Following the Commission’s review, the Council may approve, conditionally approve, or disapprove the Commission’s finding {see id. § 197-d [b] [1]). The Council acts within 50 days of the Commission’s decision, with a 15-day extension if it proposes modifications {see id. § 197-d [c], [d]). The Commission must first consider those modifications before the Council acts upon them {see id. § 197-d [d]). The City Charter requires public hearings at the Community Board, Commission, and Council stages of process {see id. § 197-c [e] [2], [h]; § 197-d [c]).
On the other hand, City Charter § 197-a authorizes community boards to sponsor “[pjlans for the development, growth, and improvement of the city” {id. § 197-a [a]). A section 197-a plan serves as a “policy to guide subsequent actions by city agencies . . . The existence of an adopted 197-a plan shall not *499 preclude . . . other plans . . . that may affect the same geographic area or subject matter” (62 RCNY 6-01 [b]). “An adopted 197-a plan can lay the groundwork for subsequent zoning change by setting forth land use and zoning policy for an area, [but] does not itself change the zoning” (Dept of City Planning, 197-a Plan Technical Guide, at 8, available at http:// www.nyc.gov/html/dcp/pdf/pub/197a.pdf [accessed Mar. 4, 2009]).
Pursuant to the section 197-a plan rules, the City reviews section 197-a plans submitted by the community boards.
“First, planning staff at DCR acting in their capacity as staff to the [Commission], review the plan to ensure it meets the threshold standards . . . DCP then recommends that the [Commission] either accept or reject the plan for further review. If the [Commission] determines that the plan meets threshold standards, it then undergoes substantive review by the local community board, borough president, the [Commission, and Council]. This evaluation process may culminate in either full approval, approval with modifications, or disapproval of the plan by the [Commission and Council].” (See affidavit of Mackintosh 1T 7; see also NY City Charter § 197-a.)
Windsor argues that the ERRC section 197-c proposal and CB 6’s 197-a plan were so modified after the December 5, 2007 hearing to require recommencing the public review process. Windsor alleges:
“The Commission had to allow CB 6 to submit its 197-c plan (dealing with the same Con Ed site as the ERRC plan), because the Commission could not refuse the mail. But the Commission stalled and stalled and finally refused to certify the CB 6 197-c plan, so that it could not be formally reviewed or reported out. They deep-sixed it, and matched the Solow 197-c with the CB 6 197-a, which studies a different area and for a planning purpose, not for a development purpose. Thus the so-called public hearing on December 5, 2007 was a sham hearing, because the public was asked to evaluate a preliminary and incomplete ERRC 197-c against a disparate CB 6 197-a.” (Petitioner’s reply brief, Nov. 21, 2008, at 6.)
In sum, Windsor contends that “the final proposal was not even presented” at the December 5, 2007 hearing but “was simply ... a sketch” (see transcript, Nov. 12, 2008, at 4).
*500 However, the public hearing requirements for ERRC’s section 197-c proposal do not extend to CB 6’s section 197-a plan. Section 197-a plans, such as that by CB 6, are not subject to ULURE (See NY City Charter §§ 197-a, 197-c [a] [1]-[12]; 62 RCNY 6-01 et seq.; see also New York City Department of City Planning, The Uniform Land Use Review Procedure [ULURP], http://www.nyc.gov/html/dcp/html/luproc/ulpro.shtml [accessed Mar. 4, 2009].) Rather, 62 RCNY 6-08 governs modifications of section 197-a plans. It states: “If the City Council, acting pursuant to the City Charter § 197-d (d) has transmitted to the Commission a proposed modification of a plan, the Commission shall, within fifteen (15) days, review the proposed modification and transmit back to the Council its findings and recommendations.” (62 RCNY 6-08 [a].)
The City properly followed the procedure laid out in 62 RCNY 6-08 when modifying and approving CB 6’s section 197-a plan.
“On March 12, 2008, the City Council’s Land Use Committee voted to approve the CB 6 197-a Plan . . . with additional modifications. These further modifications were transmitted to the [Commission] for consideration under Charter Section 197-d (d). At the March 24, 2008 Review Session, the [Commission] determined that the City Council modifications did not raise any additional land use or environmental issues requiring further review. This was conveyed to the City Council in a letter from the [Commission] Chair on behalf of the [Commission] dated March 24, 2008 . . . [Thus,] [o]n March 26, 2008, the City Council . . . approved the 197-a Plan with the additional modifications.” (See affidavit of Mackintosh lili 30-31.)
In contrast, 62 RCNY 2-06 (c) governs modifications of zoning applications like the ERRC proposal. It provides:
“(1) The Commission may propose a modification of an application, including an application for a zoning text amendment pursuant to Charter § 200 or § 201, which meets the criteria of § 2-06(g) below. Such proposed modification may be based upon a recommendation from an applicant, community board, borough board, Borough President or other source. Where a modification is proposed, the Commission shall hold a public hearing on the application as referred to a community board or boards and on the proposed modification . . .
*501 “(2) The above provision shall not limit the Commission’s ability to make a minor modification of an application.”
Clearly, the Commission may make minor modifications to an application at the time of vote (see 62 RCNY 2-06 [c] [2].) Similarly, the Commission may make a “major modification,” or those meeting the criteria of 62 RCNY 2-06 (g) (5), only after a public hearing (see 62 RCNY 2-06 [c] [1]). The rule ensures that significant modifications fundamentally altering a proposal are heard at public hearings. A modification requires a new ULURP application and public hearing if it:
“(A) increases the height, bulk, envelope or floor area of any building or buildings, decreases open space, or alters conditions or major elements of a site plan in actions (such as a zoning special permit) which require the approval or limitation of these elements;
“(B) increases the lot size or geographic area to be covered by the action;
“(C) makes necessary additional waivers, permits, approvals, authorizations or certifications under sections of the Zoning Resolution, or other laws or regulations not previously acted upon in the application; or
“(D) adds new regulations or deletes or reduces existing regulations or zoning restrictions that were not part of the subject matter of the earlier hearings at the community board or Commission.
“If the Commission has determined that no additional review is necessary and that, either, no significant environmental impacts will result or that possible environmental impacts can be addressed in the time remaining for Commission and Council review, it shall so report to the Council. The Commission may also transmit any comment or recommendation with respect to the substance of the modification, and any proposed further amendment to the modification which it deems as necessary or appropriate.
“If the Commission has determined that the proposed modification will require a supplementary environmental review or the initiation of a new application, it shall so advise the Council in a written statement which includes the reasons for its deter- *502 urination.” (See 62 RCNY 2-06 [g] [5] [ii].)
Here, the Commission’s modifications to the ERRC proposal did not meet any of the criteria listed in 62 RCNY 2-06 (g) (5) (ii). In fact, they were a response and accommodation to complaints voiced by the public. The Commission’s modifications reduced the project’s size and scale and did not fall within any of the categories in 62 RCNY 2-06 (g) (5) (ii). (See affirmation of Karnovsky HIT 16-22.) Moreover, the Commission determined that the modifications did not warrant additional land use or environmental review using the guidelines in 62 RCNY 2-06 (g) (5) (ii) (see affidavit of Mackintosh 1i1f 30-31). Indeed, earlier, the review process included “major” modifications necessitating further public review, and that review process was followed (see affirmation of Karnovsky Ii 19; respondent City exhibits 29, 32-33). Thus, the Commission could adopt the minor modifications following the December 5, 2007 hearing without further public review or comment.
Conclusion
In an article 78 petition, a reviewing court is limited to determining whether the agency determination is arbitrary and capricious or an abuse of discretion (see e.g. Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 230-231 [1974]). Judicial reversal of an administrative order pursuant to CPLR article 78 is for instances in which the agency acted arbitrarily or capriciously (see Matter of Fiore v O’Connell, 297 NY 260, 262 [1948]). A determination is arbitrary and capricious if it is untenable as a matter of law (see Siegel, NY Prac § 561, at 967 [4th ed 2005]). If a rational basis supports an administrative order, judicial review is narrow, and the court must uphold the agency’s finding (see Pell, 34 NY2d at 231).
Because respondents complied with the requisite procedures in this case, the petition is denied.

. The petition originally denominated petitioners as “Tenant-Shareholders of 5 Tudor City Place,” a group of individuals from a cooperative apartment building near a development site. On August 5, 2008, the parties agreed to substitute Windsor Owners Corporation as the denominated petitioner for standing purposes.

. In a hearing on December 5, 2008, the court dismissed the case against Mr. Solow (see transcript, Dec. 5, 2008, at 27; see e.g. TNS Holdings v MKI Sec. Corp., 92 NY2d 335, 339 [1998]; Matías v Mondo Props. LLC, 43 AD3d 367, 367-368 [1st Dept 2007]).

. Consistent with 62 RCNY 2-06 (d), the Commission provided notice of the time, place and subject of the public hearing “by publication in The City Record on November 21, 2007, November 23, 2007, November 26, 2007 through November 30, 2007, and December 3, 2007 through December 5, 2007” (see affidavit of Mackintosh U 32; see also respondent City exhibit 15). The Commission also published notice in its comprehensive city planning calendar (see id. V 33). Separate notice of the hearing also appeared in the City Record and the New York Post on November 19, 2007. The DPC also mailed notice of the public hearing to CB 6. (See respondent City exhibit 13.)

. The elected officials included Member of Congress Carolyn B. Maloney, Council Members Jessica Lappin and Daniel R. Garodnick, and Manhattan Borough President Scott M. Stringer (see respondent City exhibit 16).